**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CE'MONNE HANNA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-1009 |
| | ) | |
| v. | ) | Magistrate Judge Robert C. Mitchell |
| | ) | |
| GIANT EAGLE INC.  and | ) | |
| BENJAMIN SIMMONS | ) | |
| Defendants. | ) | |

ROBERT C. MITCHELL, United States Magistrate Judge

## I.      RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment filed by Giant

Eagle, Inc. and Benjamin Simmons [ECF No. 70] be granted in part and denied in part.

Specifically, it is respectfully recommended that the motion for summary judgment be: 1)

granted in part at Counts I and II as to the claims of racial discrimination the application of the

attendance policy, and denied in all other respects; 2) granted in part as to Counts III and IV as to

the hostile work environment constructive discharge claims and denied as to hostile work

environment more generally; 3) granted in full at Counts V and VI as to the retaliation claims;

and 4) denied as to Counts VII and VIII.


## II.     REPORT

### A.  <u>Introduction</u>

Plaintiff Ce'Monne Hanna, a 32-year old African-American female, sues her former

employer Giant Eagle, Inc. and one of her former managers, Benjamin Simmons, claiming she

was subject to racial discrimination while employed as a pharmacy technician in the McKees

Rocks Giant Eagle pharmacy.  She has filed a seven count complaint. [ECF No. 1-2].  Counts I

and II allege racial discrimination against Giant Eagle, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955, respectively. Counts III and IV allege hostile work environment under Title VII and the PHRA against Giant Eagle. Count V alleges retaliation against Giant Eagle in violation of the PHRA, and Count VI alleges retaliation against Ben Simmons in violation of the PHRA. Count VII alleges battery against Giant Eagle. Count VIII alleges battery against Simmons.

This cause of action was originally filed in the Court of Common Pleas of Allegheny County and was removed on August 3, 2015. The matter was referred to the undersigned after a party elected to have a district judge assigned to the case. 28 U.S.C. § 636(c)(1). [ECF No. 17].

On October 6, 2016, discovery in this case ended. On October 27, 2016, Giant Eagle and Simmons filed a Motion for Summary Judgment [ECF No. 70], a Brief in support [ECF No. 71], a Concise Statement of Material Facts ("SOF") and an Appendix in support. [ECF Nos. 72, 73]. Hanna has responded with a Brief in Opposition [ECF No. 77], a Responsive Concise Statement of Material Facts [ECF No. 78] ("Resp. Fact"), and an Appendix [ECF No. 79]. Defendants have filed a Reply Brief [ECF No. 80].

The matter is now ripe for disposition. This court has subject matter jurisdiction over plaintiff's federal claims based on 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a), and on 42 U.S.C. § 2000e–2(a). The court can exercise jurisdiction over plaintiff's pendent state claims under 28 U.S.C. § 1367. Venue is proper in this court under 28 U.S.C. § 1391 since the alleged unlawful employment practices occurred in the Western District of Pennsylvania.

### B. **Factual Background**

Unless otherwise noted the following facts are not in dispute. Hanna was hired by Giant Eagle on November 22, 2013 to work as a pharmacy technician in the McKees Rocks Giant

Eagle pharmacy. Plaintiff contends that from the time that she was hired until her employment ended less than one year later on October 6, 2014, she was discriminated against by numerous Giant Eagle employees because of her race.

1. **Hiring Process and Initial Training**

Hanna applied for the position through an online application, was soon contacted by Giant Eagle, and participated in a phone interview. ECF No. 78 at 18. Hanna was then invited for an in-person second interview scheduled for November 6, 2013. She alleges that when she showed up for the interview, she first went to the employee smoking area to have a cigarette. While there, she said "hi" to a woman who "looked like she could be management," but the woman did not respond or acknowledge her. Hanna contends that this is the first instance of discrimination and that the woman did not talk to her "[b]ecause I was black." Hanna observed the woman conversing with a white person who came to the smoking section after Hanna. Resp. Fact ¶ 4. The woman said in a "condescending" manner that Hanna should "sit down" after Hanna told her she had an appointment to be interviewed. Resp. F ¶ 5. Hanna again approached the table and introduced herself for her interview, and the woman said "I didn't know you were you" and told her that she was going to get the Pharmacist. When the woman returned, she told Hanna that the head Pharmacist "didn't have time" for her, and that Hanna would instead meet with Sarah Floyd. Hanna contrasts this allegedly racially hostile interaction with her first conversation with the same woman on the telephone for her first interview; when the woman did not know Hanna's race – at that point the woman was "delighted" to meet Hanna. Resp. F. ¶ 5.

Hanna then interviewed with Sarah Floyd, a licensed pharmacist who worked at the McKees Rocks pharmacy. Floyd offered the job to Plaintiff at the end of the interview. Despite being offered the job by Floyd the same day, Hanna was "offended" by the interview because

she claims that Floyd "lied" about the duties of the job and, according to Plaintiff, was "disgusted" by Hanna because she was black. SOF at ¶5. Hanna remembers Floyd saying that Hanna "won't be doing much work . . . won't really be touching anything" and told Hanna not to "get overly excited. Resp. Fact ¶ 113. Hanna remembers Floyd saying "[all] you'll be doing here is answering the phone and ringing people out." Resp. F. ¶114.

Hanna now claims that Giant Eagle discriminated against her by refusing to give her information about the job for "weeks and weeks and weeks." She claims Giant Eagle withheld crucial information until training; she contends Giant Eagle would not tell her what her rate of pay would be. SOF at ¶9; Resp. F ¶9. Nevertheless the record evidence shows Giant Eagle confirmed the employment offer by email and letter dated November 8, 2013. The letter specifically informed Plaintiff that she was being hired as a "Pharmacy Tech, Probationary PT [part-time]" (brackets supplied) at $9.00 per hour. SOF at ¶6; ECF No. 73 at 173. On November 13, 2013 Hanna was sent an email welcoming her to the Giant Eagle Pharmacy team and explaining the process for registering online, attending a welcome workshop, and attaching a team member handbook. ECF No. 175-76.

Hanna requested additional verification of her employment status by email dated December 10, 2013; her childcare agency needed confirmation she worked at least 20 hours and what her start date would be. Resp. F. ¶ 7; ECF No. 79 at 163. Hanna emailed Giant Eagle on December 30, 2013 stating that she needed an offer letter "stating my position title and pay rate as well as if I am fulltime or part-time" so that she could give it to the agency that was providing her childcare. ECF No. 73 at 174. Giant Eagle resent the November 8, 2013 offer letter the next day. SOF at ¶¶7-8.

Hanna also alleges that Giant Eagle discriminated against her by refusing to give her full

time hours.  Yet Hanna admitted that she was hired as a part time employee because she was not available to work on Tuesdays and Thursdays. SOF at ¶10; ECF No. 73 at 174.   In her email dated December 30, 2013 to Christie Engel and Rebecca Labutis she specifically states, "I have one Biochemistry Class which will meet every Tuesday and Thursday mornings" and asks that Giant Eagle "[p]lease keep this into consideration."  ECF No. 73 at 174.  According to Hanna, she wanted to work full-time and applied for a full-time slot but was informed by Defendant that she could not work full-time on evenings and weekends because of a schedule conflict with interns. Plaintiff asserts that similarly situated non-minority employees with less seniority than Hanna were permitted to work the schedule that she requested. Resp. F. ¶ 10; ECF No. 73 at 21-25.

All new Giant Eagle employees must complete an orientation training class before beginning employment. New employees are required to bring proof of citizenship – an identification card and a social security card – to the orientation or they will not be permitted to participate. SOF ¶ 11; ECF No. 73 at 176.   Hanna arrived at the November 14, 2013 orientation without her social security card.   Plaintiff denies she was specifically told prior to the orientation to bring the proof of citizenship documents with her to the orientation.  Resp. F. ¶ 12. The record reflects an email was sent to her on November 13, 2013 telling her to "note the details of your Welcome Workshop" dated November 14, 2014 from 3:30 – 6:30 p.m.; the email explained she must bring "***the necessary original documentation that matches [her] selection in the I-9 portion of the New Team Member forms to have it verified by a company representative.***" ECF No. 73 at 176 (emphasis in original). As a result, Hanna was not permitted to participate in the orientation and she was rescheduled for orientation on a later date. Plaintiff testified this was due

to her race but admits she was told to bring it.[1]  Plaintiff was rescheduled for orientation shortly

thereafter on November 22, 2013. This time, Hanna brought the required documentation and was

permitted to attend. SOF at ¶¶ 11-14. Employees are provided a Giant Eagle handbook and other

materials at the orientation.  ECF No. 73 at 178.

     After orientation and before beginning employment at the store, new employees are

required to complete on-line training in certain additional subjects through Giant Eagle's

---

[1] A. The only thing I thought was kind of discriminatory was that [the orientation trainer] didn't let me to the first class without my Social Security card.  But that was up to her discretion.

Q.  You were told to bring that to class?

A. Correct.

ECF No. 73 at 65.
     Hanna also testified as follows:
A.  … I went and I was supposed to bring my ID and my Social Security card.  But for some reason I didn't have my ID, excuse me, I didn't have my  Social Security Card.  So at that point she said that I couldn't do the orientation.

Q.  First orientation?

A.  Correct.

Q. But they had given you something before saying you need to bring this?

A. Yea, of course, it's a job.

Q. Right. So you couldn't do that orientation.  And you don't think that they came up with those requirements because of your race, do you?

A. I kind of do.  The only reason why I say that is because -- I mean, I don't what [sic] their policy is in human resources, but the only reason why I say that is because it was only like a two-hour orientation.  And I think you have up to so many days to supply a Social Security card to your employer while you're working.

Q.  According to Giant Eagle or according to somebody else?

A.  Just according to the law.

Q. Okay.  But if Giant Eagle sent you a form saying –

A. That was fine.

Q. – you have to bring X and Y, and you don't bring it, they didn't just come up with that for you, that requirement?

A. No, they didn't come up with that for me.

Q. So, how is it because of your race?

A.  I guess I would say it was because of my race simply because, like I said before, in the state of Pennsylvania you should be able to work without your Social Security card for so many days.  But I was only being there for two hours and I could have brought it to her.  I could have even scanned it and sent it to her once I got home, or brought it back for her to look at, because I know you have to actually look at it.

Q. Do you have any evidence that they didn't treat other people the same way who forget their documents?

A. I think, I'm not certain, but I think the girl that was in my second class didn't have something that she was supposed to have, but she was already a Giant Eagle employee.

ECF No. 73 at 46-48.

Learning Resource Center ("LRC"). All new employees are told that LRC training is a prerequisite to employment and that the employee can begin LRC training immediately after completion of orientation. Employees are provided a personal access code to the LRC and instruction on how to complete the training. Upon gaining access to the LRC, each employee has an on-line "To-Do" list that he or she must complete before beginning employment. Affidavit of Suzanne Martin (Team Member Relations Specialist assigned to McKees Rocks pharmacy) at ¶¶ 8-9, ECF No. 73 at 178.

Hanna asserts that Defendant was purposefully trying to delay her employment, as another instance of alleged discrimination, by failing to contact her "for weeks and weeks and weeks." On Friday, December 6, 2013 – two weeks after she had attended orientation – Hanna telephoned Giant Eagle's MyHR Connection, an employee help line for Giant Eagle employees that connects employees to the appropriate person at Giant Eagle who can provide the requested assistance, because she was having difficulty working within the LRC platform and completing her training. Suzanne Martin has stated in her sworn affidavit that Giant Eagle attempted to respond to Hanna's call on the next business day (December 9), twice on December 10, and once more on December 12. Giant Eagle records of the interaction state Hanna "did not accept" the calls. SOF ¶ 17; ECF No. 73 at 196. Hanna denies she did not accept these calls. Resp. F. ¶ 17. Finally, on December 12, the issue appears to have been resolved and Hanna's LRC training was completed and recorded. ECF No. 73 at 197.

Once that occurred, Giant Eagle contacted Hanna on December 16, 2013 to schedule her for "on boarding," or pharmacy-specific training, a requirement for all new employees hired as probationary pharmacy technicians. . SOF ¶ 18; ECF No. 73 at 202. Giant Eagle will not schedule a new pharmacy tech employee for onboarding training until the employee has fully

completed general orientation training. On-boarding training, which takes place in an actual working Giant Eagle pharmacy location, lasts a maximum of five days and is taught by a Giant Eagle pharmacy trainer. The pharmacy trainer schedules the date, time and location of the training depending upon various factors, including the number of trainees, their respective locations, and the size of the pharmacy needed to accommodate the training. SOF at ¶20.

On December 16, 2013, Giant Eagle emailed Hanna and informed her that she had been scheduled for a 4-day onboarding training course to be held at the Donaldson's Crossroads and Washington Giant Eagle stores, both of which are located in Washington County, Pennsylvania. SOF ¶ 21. Because Hanna relies on public transportation and there were no bus routes to those locations, she did not attend the scheduled training. SOF ¶ 22. She called Giant Eagle and explained she needed to use public transportation within Allegheny County. Resp. F. ¶ 22. Accordingly, three days later, on December 19, 2013, Giant Eagle rescheduled Hanna for an onboarding training course to be held at the Giant Eagle location in Robinson Township, Allegheny County beginning on December 23, 2013. SOF ¶ 23. Hanna responded that she "look[ed] forward to start training" and did not complain to Giant Eagle about the location. ECF No. 73 at 229.

Hanna now alleges that, by scheduling onboarding training at locations where there were no public bus routes and by not scheduling training at the McKees Rock location where she would be working, Giant Eagle was purposely discriminating against Hanna and "discouraging her from the position" because she is black. SOF at ¶¶21-25. All of the individuals training with Hanna were employed by Defendant for their McKees Rocks location. Of the class, only one person of five was non-minority. Resp. F. ¶ 25. Although Hanna claims she was not scheduled to train at the McKees Rocks store because she is black, her cousin, Essence McKamey, who is

also black, was trained at the McKees Rocks Store where she was assigned to work. SOF ¶ 26.

Hanna attended the onboarding training classes at the Robinson location and completed her onboarding training on December 27, 2013. SOF ¶ 27. Hanna had informed Giant Eagle by email that she was not available to work on January 3, 6 and 7 because of scheduled court dates; Giant Eagle therefore scheduled her first day of work at the McKees Rocks Giant Eagle pharmacy as a probationary pharmacy technician on January 8, 2014. SOF at ¶¶ 27-28; ECF No. 73 at 174.

### 2. Pharmacy Technicians' Duties and Training

Giant Eagle has submitted the Affidavit of Zachary Weisser (Pharmacy Intern at McKees Rocks Giant Eagle from 2010 to May 2014, and a Pharmacy Manager beginning in September 2014) and Kristin McNicholas (Regional Trainer for Giant Eagle's pharmacy department who trained Hanna at her pharmacy on-boarding). These individuals explain the following. Pharmacy technicians at Giant Eagle work at four different work stations in the pharmacy and they will generally rotate through these four workstations during their shift in accordance with the daily schedule (the "grid") prepared by the pharmacy manager. ECF No. 73 at 230. The four work stations are (i) front end, (ii) front end help, (iii) data entry, and (iv) filling. ECF No. 73 at 230. The duties of the "front end" technician are generally cashier type duties that include greeting the customer, handing the prescribed medication to the customer, and collecting the payment or required co-pay for the prescription from the customer. ECF No. 73 at 230-31. When working the "front-end help" station, the technician will handle any customer overflows, accept customer drop off prescriptions, and assist the pharmacist as needed. Technicians working the "data entry" station must read and interpret prescriptions received by the pharmacy and enter the appropriate prescription information into the computer system. Finally, the technicians working the "filling

station" are required to count out the proper amount of medication required by the prescription, place the medication in the proper container, and put the prescription label on the container. SOF at ¶¶29-30; ECF No. 73 at 231.

Hanna disputes that an employee's rotation between those four positions can legitimately depend on their skill and experience, as set forth in the daily grid schedule. According to Hanna, it is inaccurate to say that all trainees at the beginning of their employment primarily work at the front of the pharmacy unless they have prior experience, and also begin to fill prescriptions. Rather, she asserts, all pharmacy technicians were allowed equal access to all four stations, except Hanna and other minority employees. Resp. F. ¶ 29.

The pharmacy technician position is a challenging job that requires employees to learn and practice new skills in an environment that is at times very stressful, particularly when the pharmacy is busy. During 2014 when Hanna was employed, Giant Eagle experienced an approximate 70% turnover rate at the position among new probationary employees. SOF at ¶31; ECF No. 73 at 230. New hires for the pharmacy technician position who have no prior experience are probationary employees and are required to complete pharmacy-specific training during the probationary period and to pass certain tests to become permanent employees. SOF ¶ 32; ECF No. 73 at 231.

A probationary technician must first complete the onboarding training discussed above before he or she is permitted to work in a pharmacy. Attached to the Affidavit of Kristin McNichols is the Giant Eagle Pharmacy Technician Training Outline and Gateway Exam. ECF No. 73 at 223-224. It reflects the following. Upon completion of the on-boarding training, the probationary technician is eligible to work the front end, front end helper and filling stations, but not the data entry station. (Hanna disagrees with the notion that after on-boarding, employees are

not yet eligible to work the data entry station.  Resp. F. ¶ 33).  After completing onboarding

training, a probationary technician must pass a "Level 1" test which evaluates the technician's

skills and knowledge learned during the onboarding training. Although there are no hard dates as

to when the probationary technician must take the Level 1 exam and the timing is left to the

discretion of the pharmacy trainer, the general guideline at Giant Eagle is that it be taken within

30-60 days of employment in the pharmacy.  ECF No. 73 at 223.  Hanna passed her Level 1

exam on March 7, 2014. SOF at ¶¶33-34.

Thereafter, a probationary technician is required to attend a course in Prescription

Comprehension, Pharmacy Calculations and Pennsylvania Qualification ("Level 2" course) and

he or she is then tested on the subjects covered in the course, preferably within 120 days of

employment, although it may be as late as 180 days. The Level 2 exam may only be taken twice

and the probationary technician must pass the test to remain employed in the pharmacy.  SOF  ¶

35; ECF No. 73 at 223-224.

Shortly after she had passed the Level 1 test, according to Giant Eagle,  Hanna was given

the opportunity to take the Level 2 course that was scheduled for March 20 and 27, 2014 .  By

email dated March 11, 2014, Christie Engel asked that Hanna be notified of the class. ECF No.

73 at 248-49.  The email to the pharmacy team leader from Engel states "[t]his training is the

first step before one may take the Data Entry testing."  ECF No. 73 at 248.  Hanna denies she

was informed that she was eligible to take the Level 2 course, and testified that Defendant

affirmatively prevented her from learning about the Level 2 course.  Resp. F. ¶ 36.   Hanna

instead waited until April 23, 2014 to complete the Level 2 course. SOF ¶36. Hanna claims she

was forced to take the examination twice.  Resp. F. ¶ 37.    Hanna took and passed the Level 2

test on May 9, 2014. SOF at ¶¶35-37.

The Level 2 course is where the data entry function and its requirements are first introduced to the technician trainees. The data entry function includes (i) interpreting and entering all information from a prescription into a computer system in accordance with the applicable software protocol and (ii) interfacing the patient's health care coverage with the requirements of the applicable health care provider/insurer. According to Giant Eagle, data entry is the most difficult function performed by pharmacy technicians and it is critical that a technician be proficient in this function for purposes of both pharmacy efficiency and patient safety. A prescription that is incorrectly entered into the system will, in the worst case scenario, result in the wrong prescription being given to the patient and, in the best case scenario, result in a delay when the error is discovered down the line and the prescription has to be re-entered and re-filled to correct the error. SOF at ¶38.

Hanna denies that data entry is the most difficult function performed by pharmacy technicians, because the Fill Station (where the medication is counted, put in the container and labelled) is supposed to catch data entry errors. Resp. F. ¶ 38.

According to Giant Eagle, and Hanna disputes this, due to the critical nature of the data entry function, probationary technicians are typically not assigned to the data entry station until after they have attended the Level 2 course. Thereafter (and generally not before) a probationary technician may begin to rotate into the data entry station and begin on-the-job training in the data entry. Giant Eagle asserts that despite the fact that Hanna was told that she needed to take the Level 2 course before she could begin training in data entry – she delayed her ability to train at the data entry station by nearly one month when she passed on the offered March 2014 Level 2 course and chose instead to take the course in April. SOF at ¶¶ 39-40. Hanna has sworn in an affidavit that she was not told she needed to take a Level 2 course until after she made several

complaints in regards to rotating to the data entry position. Hanna denies she is responsible for the delay in her training, as she was not informed that the training was either necessary nor available. Resp. F. ¶ 40.

Giant Eagle prefers that on-the-job data entry training be completed by the probationary technician's 180th day of employment, at which time he or she is required to pass a data entry test, preferably by day 180 but no later than day 270. SOF ¶ 41. To pass the data entry test, a technician trainee must be able to accurately enter into the system a minimum of 24 prescriptions in one hour, but preferably should be able to enter a minimum of 40 prescriptions in one hour. SOF ¶ 42. Those who pass the test by entering the minimum 24 prescriptions can become permanent employees (i.e., are no longer probationary), but only those technicians who can enter a minimum of 40 prescriptions per hour are assigned to the "primary" data entry station during busy periods when the pharmacy is receiving a high volume of prescriptions. High volume prescription activity typically occurs weekday mornings and early afternoons (9 a.m. to 3 p.m.) when physicians' offices are open. Those who cannot process 40 prescriptions per hour and/or have not passed the data entry test continue to train on data entry by working the "secondary" data entry station or the primary data entry station during times when it is less busy (late afternoons and weekends). In this way, trainees who have not yet become proficient in data entry are not overburdened so as to cause data entry errors, pharmacy delays, and/or the issuance of an incorrect prescription to a patient. SOF at ¶¶41-44. Hanna states this information was hidden from her. Resp. F. ¶¶ 43, 44.

**3. Alleged Workplace Discrimination—Filling Station and Data Entry Station**

Hanna contends that, because she is black, she was not permitted to rotate through the

four technician stations and that she was generally required to work the front end stations. SOF ¶ 45.  Hanna claims this arose early in her employment, she was not permitted to rotate to the filling station position.   Hanna contends that co-workers instructed her to move to the front end because she is black; according to Giant Eagle they were actually motivated by their desire to avoid having to work at the less desirable front end positions so as to avoid the "intense labor" and having to "deal with the customers." Hanna's cousin, Essence McKamey, an African-American female who worked at the pharmacy before Hanna, testified that the same co-workers Hanna has mentioned tried to force McKamey to work the front end but failed because McKamey refused to move and, as a result, she worked the stations to which she was assigned. She believes that they treated Hanna in that manner "because she was small." ECF No. 73 at 252. When asked if management was aware of rudeness to black employees, McKamey stated:

> A. Oh, yeah.
>
> Q. How did you know that management was aware?
>
> A. They would be right there.  They didn't care.
>
> Q. So by that, do you mean management would be nearby while these things were happening?
>
> A.  Yeah.  But I don't know if they took it – because Casey [Howard], like, she was a rude person all around.  So I don't know if they just took it as that's her personality, letting it slide because she was working there for so many years.  I don't know.  But yeah, she was – she was just a rude person all together.
>
> Q. Was she rude to white employees as well as black employees?
>
> A.  Yeah, sometimes.  But for the most part, it would be toward black people.

ECF No. 73 at 253.

McKamey testified that Howard and another white woman "had some type of vendetta against each other" where they would argue about which one of them have to go up front.

SOF at ¶¶ 45, 47-49.

In February 2014, Defendant Benjamin Simmons became the pharmacy manager at the McKees Rocks pharmacy. The pharmacy manager is the supervisor of the pharmacy technicians and prepares the work schedules for the technicians, including the "grids". Hanna testified that when Simmons became the manager, she complained to him that she had not been rotating; she further states that Simmons "took charge" of the pharmacy and after Hanna complained, Simmons told Casey Howard and Kate Rich that they had to rotate with Hanna. Thereafter Hanna worked the filling station more. Resp. F. ¶ 53. Nevertheless, Hanna contends that although Simmons would "try" to let Hanna rotate, "the other girls (Howard and Rich) would give him a hard time" and would not cooperate. SOF at ¶¶ 50-54.

Hanna testified that Defendant Simmons attempted to allow her to rotate to all the positions, but she was not allowed to rotate or to perform data entry, and in fact was not scheduled for data entry until after filing a Charge with the EEOC. Resp. F. ¶ 45. According to Hanna, Simmons soon succumbed to not allowing Hanna to rotate throughout the pharmacy, and did not instruct Hanna that she needed a Level 2 course, but in fact mislead Hanna that she had to count a certain number of prescriptions per hour. Resp. F ¶ 52. Hanna further testified that she was subject to testing on her counting ability before she could do data entry. Resp. F. ¶ 45.

Zachary Weisser, who replaced Simmons as the pharmacy manager at the McKees Rocks pharmacy in September 2014, states he never saw anyone instruct Hanna to move to another station to which she was not assigned, nor did Hanna ever complain to Weisser that she was being forced to move to another station. SOF ¶ 46. Hanna disagrees. Hanna claims Weisser personally witnessed Hanna being told to move to the cash register, personally instructed Hanna to move to the cash register, and personally received Hanna's complaints about being forced to

the cash register.  Resp. F. ¶ 46.

According to Giant Eagle, because Hanna did not take the Level 2 course until April 23, 2014, she would not have been permitted to begin on-the-job training at the data entry station from January 8, 2014 through April 23, 2014. SOF ¶ 57.    After Hanna completed the Level 2 course on April 23, 2014, she was permitted to rotate through the data entry station for purposes of on-the-job training. Because she had not yet taken the data entry test or shown a proficiency in data entry, she was scheduled for data entry at less busy times. Hanna never became competent at data entry during her employment. She never passed the data entry test (requiring a minimum of 24 prescriptions per hour), and did not come close to meeting the 40+ prescriptions/hour requirement that would have allowed her to be assigned to the primary data entry line during busy times. SOF at ¶57; ECF No. 73 at 233.

Hanna denies this, instead stating that her alleged incompetence is wholly the fault of Defendant who refused to allow Hanna to work on data entry, as she was affirmatively prevented from performing the task, lied to about the requirements, and had the actual requirements hid from her.  Resp. F. ¶ 57.  Hanna states she was never allowed to take the data entry test.  Resp. F. ¶ 57.

According to Giant Eagle, Hanna refused to take the data entry exam.  In support of that claim, Giant Eagle notes that Christie Engle, who was the regional pharmacy trainer for the region that includes the McKees Rocks pharmacy during Hanna's employment, specifically mentioned Hanna's data entry deficiencies – and her reluctance to be tested on data entry – in her contemporaneous training notes.   Engle also noted that on a day that she had scheduled Hanna for two hours of data entry training, Hanna left work early before the training could take place. The Regional Technician Trainer/DL Communication forms around that time state, "Cemmone

needs to step it up to [data entry] she is beyond due for testing. (but "cherry picks" what she wants to do) and struggles with that"; Hanna left work early when she "was on grid to do DE with me for 2 hours later after commenting to Ben that she needs [data entry]. She is OVERDUE for her data entry test but keeps putting off testing." SOF at ¶58; ECF No. 73 at 279, 281.

Engle had written comments about other employees around the same time. She wrote the following on August 9, 2014 about another black pharmacy technician trainee at the McKees Rocks pharmacy, Dionne Reid: "Dionne @2 is AMAZING!!! She came with experience and will be a valued team member!" SOF at ¶ 60; ECF No. 73 at 275. In the July 12, 2014 PDL Communication Form, Engle also stated that a white female, "Deb P." at store #62 (Debra Patterson), "needs to step up with DE . . . she IS given opportunity she is WELL PAST DUE." SOF at ¶59; ECF No. 73 at 279.

In September, 2014, when Weisser replaced Simmons (who had been fired earlier for reasons unrelated to this lawsuit) as the pharmacy manager at the McKees Rocks pharmacy, Weisser recognized that Hanna was struggling to learn the data entry function and that she had not progressed as expected. SOF ¶ 61. In his Affidavit, Weisser states:

> Hanna was struggling to learn the data entry function and throughout her employment didn't progress to the required levels. She never took or passed the data entry exam or achieved the minimal standard of 24 prescriptions per hour. When she was assigned to the secondary line, Ms. Hanna would begin typing and then start asking numerous questions that were basic such as the procedure to find a patient in the system or the code for a particular drug.

ECF No. 73 at 233.

Hanna denies that she was struggling to learn data entry, and says she was prevented from doing so. Resp. F. ¶ 61.

Weisser offered to schedule Hanna to work on weekends because the pharmacy was

slower and he would have more time to work with her, but Hanna declined the offer and stated that she would not work weekends and that she could only work 10:00-6:00 on Mondays, Wednesdays and Fridays. ECF No. 73 at 233. As a result, and due to her inability to master the data entry skills, Weisser scheduled Hanna either to the secondary data entry station or to the primary data entry station in the late afternoons, when the pharmacy was not as busy and her limited skills would not compromise the efficient and safe operation of the pharmacy. ECF No. 73 at 233. During the busy times Weisser assigned only experienced or very competent technicians to the data entry function, and explains that assignment to the data entry lines was not based on seniority but rather was based on competency and the demands of the business. ECF No. 73 at 233. Weisser states, "[d]uring the times that Ms. Hanna was assigned to the secondary line, the line moved very slowly." ECF No. 73 at 233. At these times Weisser also surrounded Hanna with supportive personnel who could continue to train her and also pick up any slack caused by Hanna's limited skills. SOF at ¶¶ 61-64.

In contrast to Weisser's account of what happened Hanna claims she was "occasionally" scheduled for data entry under Zachary Weisser, but rarely permitted to perform data entry functions, and denies being surrounded with personnel during those times she was at the data entry position. Resp. F. ¶ 63. Hanna denies struggling with data entry, denies she refused to work weekends to get additional data entry time, and denies refusing to take or delaying the data entry test. Resp. F. ¶ 62; ECF No. 79-9 at 5.

Weisser wanted to give Hanna some opportunity to work on the primary data entry line to obtain the necessary experience, and accordingly, as reflected in the assignment grid records, he scheduled her to work the primary lines on September 19, September 26, and October 6, 2014. ECF No. 73 at 234, 239, 242, and 243. On October 6, 2014 – the last day that Hanna showed up

for work – she was scheduled to work starting at 11, rotating to the primary data entry station at 5 p.m. during the slow period. ECF No. 73 at 243. She never worked data entry that day, however, because Hanna walked off the job at 1 p.m., 5½ hours before her scheduled shift was over. Hanna has stated that a co-worker named Beverly yelled at Hanna and called Hanna a "bitch" and "was trying to attack" Hanna. Hanna felt physically threatened. ECF No. 79-2 at 179. Hanna testified that starting in June of that year Beverly would say "you're suing us and you're trouble", that Hanna was "stupid" and "why can't [Hanna] just not touch the computers." ECF No. 79-2 at 182.

According to Giant Eagle, Hanna did not get permission from her supervisor or anyone else at Giant Eagle to leave early nor did she tell anyone that she would not return to work and that she was quitting her job. Rather, she just did not show up again for her scheduled shifts. After three unreported absences, Giant Eagle removed Hanna from the schedule. SOF at ¶¶ 65-68.

According to Hanna, she left a message and informed Suzanne Martin (then-team member relations specialist) that she was leaving work that last day. Hanna requested Martin telephone her back before Hanna was willing to return to work. Martin never did. Hanna denies that she quit her job. Resp. F. ¶ 67; ECF No. 79-9 at 6.

In her Affidavit, Martin states:

> I have learned that Ms. Hanna alleges that she left work early on October 6, 2014 as a result of confrontations with Beverly McKee a co-worker that Ms. Hanna contends was abusive. Ms. Hanna further alleges that she left the store before her shift ended because of the confrontations, and thereafter called my cell phone and left me a voice message telling me the reason she left early and advising me that she would not return to the store until I called her back and resolved the situation. Contrary to her allegations, Ms. Hanna did not call me on her last day of work (October 6, 2016 [sic]) advising me of the circumstances and asking me to call back. In fact, Ms. Hanna never called me during any day in October 2014.

ECF No. 73 at 177-78.

### 4. Hostile Work Environment

Hanna has alleged numerous instances of racially discriminatory actions to support her claim that she was subject to a hostile work environment. She claims she suffered racially hostile comments and conduct on a daily basis. Resp. F. ¶ 71. On Hanna's first day on the job, her pharmacy co-workers did not "welcome" Hanna, did not acknowledge her, and ignored her. SOF at ¶ 69. A pharmacist (Tim) yelled at her to "shut the f___ up" when she attempted to get his attention. SOF at ¶ 70. The pharmacy co-workers would occasionally comment on Hanna's hair and refer to it as a "wig." Hanna does not wear a wig and was offended by the comments. SOF at ¶ 71. Co-worker, Casey Howard, would call her "stupid, lazy or dumb" and would not let Hanna rotate. Howard was not in a supervisory position and, according to Giant Eagle, Hanna never complained to any supervisor that Howard was mistreating her because of her race. SOF at ¶ 72. Hanna contends she complained about this conduct to Giant Eagle supervisory employees and her complaints went unanswered. Resp. F. ¶ 72.

Hanna further contends that a co-worker (Kate Rich) would show Hanna pictures and other media on her phone that Hanna considered derogatory towards black people and Rich would also make derogatory comments about black people. Rich also swore at Hanna, although she also swore at others and, as Hanna testified, "would always swear throughout the pharmacy . . . on a daily basis. Constantly." Rich would also not allow Hanna to rotate. According to Giant Eagle, Rich was not in a supervisory position. SOF at ¶ 73. Hanna has stated that Defendant's supervisory employees were aware of this conduct and allowed it to continue unabated, and that she reasonably believed for some time that Casey Howard was in a supervisory position, because other supervisors allowed her to give Hanna orders. Resp. F. ¶ 73.

Other technicians would tell Hanna to work up front (the cash registers) when she was scheduled for the filling station or the data entry station. SOF at ¶ 74. Hanna contends Defendant's supervisory employees were aware of this conduct and allowed it to continue unabated. Resp. F. ¶ 74. Pharmacy manager (Tom Michaels) once allegedly called Hanna "stupid" and some of her co-workers called her "stupid." SOF at ¶ 75. On her last day of work she was called a "bitch" and felt under attack. SOF at ¶ 76.

On May 9, 2014, Hanna, while on break, purchased a pregnancy test and went to the women's restroom to use the test. Hanna claims that while she was sitting on the toilet in a bathroom stall, a Giant Eagle employee ("Sharon") forced her way into the stall[2] and demanded to see the receipt for the pregnancy test. Giant Eagle regularly requires employees, black and white, who purchase in-store products to show the receipt for the product, and employees who do not retain or show a receipt are subject to immediate termination. SOF ¶ 79. Hanna showed the employee the receipt and she was therefore not disciplined.

Hanna claims that the incident occurred because she is black. SOF at ¶ 77. Hanna stated she communicated the racial aspect of Sharon's behavior to Giant Eagle insofar as as the nature of Sharon's accusation reflects a well understood racial bias in the retail context. Resp. F. ¶ 77.

### 5. **Disciplinary and other Performance-based Feedback During Employment**

Giant Eagle has a Retail Attendance Program that applies to all of its retail employees. Hanna was provided a copy of the terms of the Attendance Program at her orientation and was aware of it during her employment. Hanna testified that she believed that the Attendance Program was "overly fair" to employees and "really, really flexible." She also acknowledged that an employee's compliance with the Attendance Program was automatically tracked by the

---

[2] Hanna's EEOC Intake Questionnaire dated May 24, 2014 describes the incident a little differently: "**upon exiting the stall**, a woman I had never seen blocked my exit and accused me of stealing." (emphasis added). SOF ¶ 77.

computer database system and not by individuals. SOF ¶ 85. The Attendance Program includes a points system that charges points to an employee based on the infraction (i.e., tardy, late, leaving work early, unexcused absence, etc.). A good attendance record results in deductions of points from an employee's total points charged. SOF ¶ 81. There is also a progressive discipline schedule whereby the more points accrued by the employee, the more significant the discipline, up to and including discharge (i.e., removal from the schedule) once the employee reaches 12 points. SOF ¶ 82.

Hanna claims that Giant Eagle – and in particular Kristin Olejar and Ben Simmons – changed Hanna's schedule from 10 a.m. to 9 a.m. without telling Hanna in an effort to try to make her late for work, but Hanna caught the change and punched in on time. SOF ¶ 80. She also claims that shortly after the bathroom incident described above, "Sharon" gave Hanna a reprimand without the requisite verbal warning, and that similarly situated white employees were warned. Resp. F. ¶ 86. On May 19, 2014 Hanna was mistakenly issued a Counseling & Corrective Action Report in which Hanna was advised that she had reached 7 points under the Giant Eagle Retail Attendance Program. SOF ¶ 84. When Hanna complained about the violation report, Giant Eagle recognized its error and reversed its disciplinary action. SOF ¶ 84.

At the time Hanna left her employment with Giant Eagle, she had accrued 6.0 points and had been suspended for one day due to attendance infractions. SOF ¶ 83. Hanna contends that she was disciplined under the Attendance Program because of her race. According to Giant Eagle, its business records (in particular the records that automatically record the date and times when Hanna punched in and out of work) establish that she was late for work and or left work early on numerous occasions and that she was properly counseled and/or disciplined under the Attendance Program.

Hanna admits she was also counseled for inappropriate behavior towards a customer on

September 26, 2014.  SOF ¶ 87, Resp. F. ¶ 87.    In his affidavit, Weisser states:

> Because Ms. Hanna was frustrated with the customer, she cut off what the customer was asking and walked away.  After concluding the transaction with the customer, I counselled Ms. Hanna and completed a Performance Feedback Form about her inappropriate behavior.  Ms. Hanna signed the form and did not tell me (at that time or any other time), nor did I hear, the customer make any discriminatory or racial comment to or about Ms. Hanna.

ECF No. 73 at 235; SOF ¶ 88. .

Hanna now claims the customer was rude and made racial comments to her.   The Giant

Eagle Team Member Handbook instructs Giant Eagle employees they are not permitted to

simply walk away from difficult, rude or combative customers unless the employee is in danger

of being physically assaulted. Rather, the employee is instructed to offer to get the Store Leader

or Team Leader to assist the customer. SOF ¶ 90; ECF No. 73 at 294. Hanna denies this was a

direct violation of company policy because she walked away only after asking Weisser if she

could walk away.  Resp. F. ¶ 88.    Hanna has stated she followed this policy because she asked

Weisser to intervene.  Resp. F. ¶ 90.

 Hanna claims that Weisser and the other pharmacy employee on duty at the time,

Kristin Olejar, conspired together with the customer to set Hanna up for discipline.  SOF ¶ 91.

Weisser's Performance Feedback from, signed and dated by him and Hanna on that same day,

does not mention racial comments by a customer.  ECF No. 73 at 247.  A similarly-situated

white employee in the McKees Rocks pharmacy (Kate Rich) was similarly counseled when

deemed to have interacted poorly with a customer.  SOF ¶ 92.

### 6.  The  EEOC/PHRA Charges

Hanna filed an Equal Employment Opportunity Commission ("EEOC") Charge of

Discrimination against Giant Eagle on August 7, 2014 that was dually filed with the Pennsylvania Human Relations Commission ("PHRC") claiming that Giant Eagle had discriminated against her because of her race during the period from May 9, 2014 through August 6, 2014. She asserted that she had been "harassed, mocked, and given several unfair disciplinary actions." She also complained that she had "been left off the grid for computer activities." Finally, she asserted that her immediate supervisor, Ben Simmons, had informed her during a meeting that she was "'spacey', 'lazy' and 'a personality that he couldn't explain.'" SOF ¶ 93.  Giant Eagle was provided a "Notice of Charge of Discrimination" on or after July 8, 2014, however, the Notice did not include any details as to the alleged discriminatory conduct. SOF ¶ 94.  There is no dispute that Giant Eagle did not receive a copy of the Charge of Discrimination until on or after December 9, 2014, more than two months after Hanna had quit her employment.  SOF ¶ 95; Resp. F. ¶ 95.

Hanna filed a second Charge of Discrimination against Giant Eagle with the EEOC and PHRC on November 16, 2014 alleging racial discrimination and retaliation from August 1, 2014 through October 31, 2014. There is no dispute that Giant Eagle received a copy of this Charge on or after April 8, 2015.  SOF ¶ 96; Resp. F. ¶ 96.

Hanna admits she did not file a charge against Defendant, Ben Simmons, with the EEOC or the PHRC.  SOF ¶ 97; Resp. F. ¶ 97.  There is no dispute that Simmons was not aware that Plaintiff had filed a charge of discrimination with the EEOC or the PHRC or that she had filed a lawsuit in which he was a named defendant until Fall 2015, long after both he and Plaintiff were no longer employed at Giant Eagle.  SOF ¶ 98; SOF ¶ 98.

Hanna claims that "a number of employees knew about the litigation process that began with the EEOC Charge" and lists Benjamin Simmons, Casey Howard, Kate Rich, Christie Engel

and others. Hanna claims each of them discussed the lawsuit with her during the time she worked at Giant Eagle. ECF No. 79-9 at 3-4. "This is when Benjamin Simmons would refer to me as bitch, refuses [sic] to help or train me, and helped and allowed Casey Howard and Kate Rich to harass me as described in the complaint and my deposition." ECF No. 79-9 at 4.

C. **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA,* 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.,* 242 F.3d 437, 446 (3d Cir. 2001).

**D. Discussion**

Generally, "'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'" *Gonzalez v. Sec'y of the Dep't of Homeland Sec.,* 678 F.3d 254, 263 (3d Cir. 2012) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 161 (3d Cir. 2009)). This rule has been extended to self-serving deposition testimony. *Irving v. Chester Water Auth.*, 439 Fed. App'x. 125, 127 (3d Cir. 2011). The ultimate question is whether Hanna's testimony, when considered in conjunction with other evidence, is sufficient for a rational factfinder to credit Hanna's testimony, in spite of the testimony's self-serving nature. *See Gonzalez*, 678 F.3d at 263 ("[T]his is a case where the court, based on all of the evidence, can say with confidence that a rational trier of fact could not credit [plaintiff's testimony]." (quotation omitted)); *see also Irving*, 439 Fed. App'x. at 127 ("In light of both his earlier testimony and other record evidence, [plaintiff's] self-serving deposition testimony is insufficient to raise a genuine issue of material fact.").

Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature.'" *Jordan v. Cicchi,* Civ. No. 10-4398, 2014 WL 2009089, at *2 (D. N.J. May 16, 2014) (quoting *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012)); (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for the purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380.

### 1. <u>Counts I-II: Racial Discrimination Claims</u>

Title VII provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of her race

or gender. 42 U.S.C. § 2000e-2(a). The PHRA similarly makes it unlawful for any employer to discharge or otherwise discriminate against an employee based on that employee's "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability...." 43 Pa. Stat. Ann. § 955(a). We apply the same standard when analyzing discrimination claims brought pursuant to Title VII and the PHRA. *See Verma v. Univ. of Pa.*, Civ. A. No. 11–611, 2012 WL 1835727, at *7 (E. D. Pa. May 18, 2012) ("Discrimination claims under the PHRA are subject to the same standards as Title VII for purposes of summary judgment," *citing Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973) and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252 53 (1981); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278-79 (3d Cir. 2000).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. *Id.* at 804. The Court of Appeals for the Third

Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Giant Eagle first argues that there is no genuine dispute of material fact that Hanna has not met the prima facie requirement of an adverse employment action. Hanna argues she suffered an adverse employment action when Giant Eagle did not permit her to rotate through the positions in the pharmacy (filling station and data entry station), unlike her white co-workers, which in turn prevented her from learning the data entry position to the subjective satisfaction of her supervisors. As a result she could not be considered a regular rather than probationary employee. She also argues she suffered adverse employment actions in the form of reprimands.

The major purpose of the prima facie case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and to raise a presumptive inference of discrimination. *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 352 (3d Cir. 1999). There is no talismanic formula for presenting a prima facie case. *Jones v. School District of Philadelphia,* 198 F.3d 403, 411 (3d Cir. 1999). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. *Waldron v. SL Industries, Inc*., 56 F.3d 491, 494 (3d Cir. 1995). Plaintiff's burden at this step is "minimal' and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. *Id.*

Given the low threshold required, Hanna has met her burden of showing evidence to

support the prima facie factor that she suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination both as to the written reprimands and as to the shift rotation assignments.  She has testified that she was not permitted to rotate through the various positions in the pharmacy, unlike her white co-workers, and she therefore struggled to learn the requirements for the positions such that she could become a regular rather than probationary employee.  She has presented sufficient evidence that her reprimands would constitute adverse employment actions because they changed the terms and conditions of her employment.

If the plaintiff presents a prima facie case, the second stage of the *McDonnell Douglas* paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action at issue.  *Keller v. Ortix Credit Alliance, Inc*., 130 F.3d 1101, 1108 (3d  Cir. 1997). The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment."  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).    If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case.  *Id*. at 511; *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Giant Eagle has met its burden of production in this regard.  It has shown that Giant Eagle required her to take the Level 2 course, and later, the data entry test.  Such proficiency is necessary, especially at the primary data entry line during busy times, so that Giant Eagle's customers would not be kept waiting.  Giant Eagle has explained that its adverse employment action as to shift assignments arose from the need to have competent employees who could meet the demands of the business.  Weisser scheduled Hanna to secondary data entry or to the primary data entry in the late afternoons when the pharmacy was not as busy so that her limited skills

would not compromise the efficient and safe operation of the pharmacy. This is a legitimate, non-discriminatory reason for the employment action.

As to the reprimands application of the rules codified in Giant Eagle's attendance policy Giant Eagle has also met its burden of production and provided a legitimate explanation for its adverse employment action. An employee's compliance with the Attendance Program is automatically tracked by the computer database system and not by individuals. The policy is applied to all its retail employees. Such records establish that Giant Eagle had reason to cite Hanna for being late for work or leaving work early on numerous occasions.

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. *Jones,* 198 F.3d at 410. At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." *St. Mary's Honor Center*, 509 U.S. at 515. This is because while the burden of production under the *McDonnell Douglas* analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones*, 198 F.3d at 410 (quoting *Burdine,* 450 U.S. at 252–53 (1981)).

Hanna has testified at length that Giant Eagle's legitimate, non-discriminatory explanation for its adverse employment actions were a pretext for racial discrimination. Certainly, as to her assignment at the filling station, her deposition testimony is contradictory; at

one point she says she was not permitted to work there and at another she admits she did. ECF No. 73 at 87 (stating she worked at the filling station five times a week for up to an hour each time). It is also apparent from the record that her non-supervisory co-workers were known to be rude, and they wanted to avoid working up front. McKamey confirms their attitude toward co-workers was also directed to others in the pharmacy, regardless of race: "But for the most part, it would be toward black people." McKamey explained that Howard and another white woman would even argue about which one of them would go up front. Even so, while Hanna contends in her deposition that she was unfairly told to go work up front (and, when she did so, they would take her place at the filling station) she admits that she never told Giant Eagle management that she believed they did so because of her race, and, further, she admits when she complained to Simmons that she wanted to rotate through the filling station, he immediately began assigning her to the position. Hanna has presented evidence that Simmons gave inconsistent testimony as to his rotation assignments, that Simmons succumbed to the culture of not allowing her to rotate throughout the pharmacy, and has shown Simmons' pattern of assigning Hanna to the cash register area. She has also testified that Simmons applied the efficiency standards to her and her alone. She has created a genuine issue of material fact in that regard.

It is true that when Weisser became supervisor plaintiff was assigned to the filling station more than any other technician (except one) during her shifts. Giant Eagle has also shown from the contemporaneous records that Hanna did not meet the minimum standard required to work the primary line data entry station, not even by the time she left Giant Eagle. The record evidence also establishes that Giant Eagle had certain objective competency standards in place which required a minimum number of prescription be filled per hour. Christy Engle, her

pharmacy trainer, and Zach Weisser, her manager, offered additional training opportunities, which Hanna declined.  It is also undisputed that by the time Weisser was the pharmacy manager, she was being routinely scheduled for data entry, albeit during less busy times.  Management felt she was not able to meet minimum standards and her inability to pass the data entry exam support that conclusion.  Engle's contemporaneous training notes reflect Hanna left work early once when she was on data entry duty, even after complaining she needed data entry time, and that Hanna kept putting off her testing.

Yet Hanna has produced evidence of pretext sufficient for there to be a factual dispute.  She has testified she was not allowed to rotate schedule data entry until after the filing of her charge with the EEOC,  that Weisser knew she wanted to be assigned to other areas, and that he saw her being told to move to the cash register by other employees and did nothing about it.  Hanna has explained that the various testing requirements were not adequately explained to her.  There is a genuine issue of material fact as to whether Giant Eagle's testing requirements were specifically communicated to Hanna.  Hanna denies she was struggling to learn data entry, and says she was prevented from doing so.  Hanna denies refusing to work weekends to get additional data entry time, and denies refusing to take or delaying the data entry test.

 In addition, Hanna has argued she suffered adverse employment actions in the form of written reprimands for alleged attendance violations.  She argues the reprimands constitute adverse employment actions because they changed the terms and conditions of her employment, and eventually led to her suspension without pay.  She also alleges the attendance policy was disparately applied.

Here, in light of the evidence that contradicts Hanna's self-serving testimony regarding alleged adverse employment action during her employment at Giant Eagle, we conclude that no

rational factfinder would credit that testimony.  Plaintiff received the following disciplinary actions: written reprimands for May 9, 2014 ("Cemonne has reached 7 points in violation of the attendance policy"), August 19, 2014 (later rescinded as issued in error) and September 9, 2014; a Counseling and Corrective Action Report dated after September 9, 2014;  and Performance Feedback on September 26, 2016 (the day she showed inappropriate behavior with a customer and walked away).  It is uncontroverted that Giant Eagle's Retail Attendance Program applies to all of its employees, and that Plaintiff was provided with a copy of its terms and was aware of it during her employment. It is also uncontroverted that when Hanna complained about the error in her absenteeism on the grounds that she had an excused absence, Giant Eagle recognized its error and reversed its disciplinary action.    More importantly, the Attendance Program was automatically tracked by a computer database system, and not by individuals.

By the time she left employment, Hanna had accrued 6 points and had been suspended for one day for attendance infractions.   The punch clock records reflect that she was late for work and/or left work early on numerous occasions.  ECF No. 73 at 182-186.  She had eight "no show' days (including the five days she was scheduled to work after her employment ended), and five "call of days" when she was scheduled to work.  She can point to no record evidence that there were inconsistencies in Giant Eagles application of the Attendance Program to support her claim that Giant Eagle's issuance of a counseling and corrective action report and one-day suspension were a pretext for racial discrimination.  She admits she was counseled for inappropriate behavior towards a customer on September 26, 2014 but now claims the customer was rude and made racial comments to her. Nevertheless, there can be no genuine issue of material fact that Giant Eagle's reprimand was consistent with company policy.  The alleged racial comments by a customer, even if true, cannot do not form a basis of liability for racial

discrimination by her employer. In addition, Hanna has asserted that Simmons and others at his direction manipulated her schedule to cause her to be late for work, but no record evidence supports her testimony. In the end, Hanna's testimony as to the attendance policy, when considered in conjunction with other evidence, is not sufficient for a rational factfinder to credit her testimony. No reasonable factfinder could believe that the issuance of counseling and corrective action reports, as well as her one-day suspension – were racially motivated.

Furthermore, based upon the record evidence before us, there is no genuine issue of material fact that would establish any racial discrimination during the hiring process, specifically, as to Hanna's claims that Giant Eagle discriminated against her by not giving her the information about the job, including the rate of pay, as well as not hiring her fulltime. No reasonable jury could return a verdict for Hanna in this regard, given the exchange of emails in late 2013 and the legitimate necessity of orientation and training.

It is therefore respectfully recommended that the motion for summary judgment be granted at Counts I and II as to the allegations of discrimination in the application of the attendance policy and hiring process, but denied in all other respects.

### 2. Counts III and IV: Hostile Work Environment/Constructive Discharge

In Counts III and IV Hanna claims she was subjected to a racially hostile work environment and therefore, she was constructively discharged. To establish a claim for hostile work environment, plaintiff must show: (1) that he suffered intentional discrimination because of his race; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected plaintiff; (4) that the discrimination would have detrimentally affected a reasonable person of the same race as plaintiff, in a like position; and (5) a basis for respondeat superior liability. *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir. 2013); *Page v.*

*City of Pittsburgh*, 114 F. App'x 52, 54 (3d Cir. 2004) (upholding dismissal of hostile work environment claims where all of the harassment allegedly occurred during one month and was not sufficiently severe). "A hostile work environment exists when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Boyer v. Johnson Matthey, Inc.,* Civ. A. No. 02–8382, 2005 WL 35893, at *12 (E.D. Pa. Jan. 6, 2005) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). In evaluating the elements of a hostile work environment claim, courts must consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 75 (3d Cir.2003); *see also West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir. 1995). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not alone give rise to a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Plaintiff testified at length that she was subject to the following while at work: offensive comments and pictures about black women's hair (referenced as a weave), comment about black babies, women and hair, pride over getting the "black bitch" fired, jokes about black sounding names, constant comments about black people on welfare, racial jokes, being called "stupid." Hanna said one employee would "often push me, bump me. She would take sharp things and , like, wave them at me. Like she would take her spatula that she filled with and would, like, wave it at my face. . . She called me stupid. She'd say because they're black, they're ghetto." ECF No 79-2 at 106-07. Hanna said this particular employee would push her at least three times

a week if not more.  ECF No. 79-2 at 107.  Another employee would say "jokes about black babies or jokes about weave and black women and hair.  She'd often joke about the patients' name, their insurances, you know that person's got to be black and on welfare.   She would push me, too.  But hers was more like a bump, where she would come next to me and bump me.  She would call me stupid every day."  ECF No. 79-2 at 109-110.  Hanna said this particular person would show her racial pictures on her phone at least once a day.  ECF No. 79-2 at 110.

 According to Giant Eagle, Hanna never complained to any supervisory that employees were racially hostile or mistreating her because of her race.  Hanna contends she reported them to supervisory officials and that some of them allowed it to continue, or failed to return her phone calls.

The evidence of these comments and Giant Eagle's response to them give rise to a reasonable inference of severe and or pervasive discrimination such that they should be heard by a jury. Some of the comments clearly were not race-based and are simply rude and inappropriate. The law in this Circuit is that " '[m]ere offensive utterances' are insufficient to create a hostile environment, even if they engender offensive feelings in an employee." *Greer v. Mondelez Global, Inc.,* 590 Fed.Appx. 170, 173 (3d Cir. 2014) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), and citing *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005)). Title VII is not a "general civility code."  Faragher, 524 U.S. at 787.  It is not intended to address "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes, and occasional teasing."  *Id.*

Yet viewing the evidence in the light most favorable to Hanna, as we must, we conclude there is a genuine issue of material fact that that the racial comments occurred with sufficient

frequency, and were severe enough to constitute the hostile work environment. A factfinder could find Hanna's testimony credible and decide based on the record before us that Hanna's "workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Peace–Wickham v. Walls,* 409 Fed. Appx. 512, 519 (3d Cir. 2010) (quoting *Morgan,* 536 U.S. at 116, 122 S.Ct. 2061).

Giant Eagle also moves to for summary judgment as to constructive discharge. To establish constructive discharge, a plaintiff must show that "'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1084 (3d Cir. 1996) (quoting *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 888 (3d Cir. 1984); *Harris v. Cobra Const.*, 273 Fed. Appx. 193, 196 (3d Cir. 2008). The United States Supreme Court in *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), explained:

> Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?

542 U.S. at 146. The Court further observed in *Suders,*

> The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable, we reiterate, [...], the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quotation marks and brackets omitted). A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g., Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (C.A. 8 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment,...the facts alleged [for

constructive discharge must be]...so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (C.A. 7 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

542 U.S. at 146-47.

Hence, Hanna's subjective perception of her workplace does not govern. Further,

[w]e employ an objective test and thus an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge. In determining whether an employee was forced to resign, we consider a number of factors, including whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations.

*Mandel*, 706 F.3d at 169-70 (internal citations omitted).

In order to survive summary judgment regarding constructive discharge, then, "the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal–Mart Stores, Inc*., 469 F.3d 311, 317 n. 4 (3d Cir. 2006).

The Court is mindful that it is to consider the totality of the circumstances and atmosphere and not to simply parse out individual events in isolation. *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149, 155 (3d Cir. 1999). Certain events advanced as discriminatory and contributory to the "hostile work environment" and eventual constructive discharge, as well the evidence related thereto, must be considered in context in order to consider the nature of the conduct, keeping in mind that the evidence is viewed in the light most favorable to Hanna on summary judgment. Yet, the Court also is not "to cobble together unsubstantiated theories from otherwise innocuous facts*." Fichter v. AMG Resources Corp.,* 528 Fed.Appx 225, 232 (3d Cir. 2013).

We conclude that even if plaintiff's factual allegations could be deemed to constitute racial discrimination or harassment, she has not shown that it was anything more than "ordinary" discrimination such that a reasonable person would have been forced to quit. Some of the unfortunate incidents may have questioned her skills ("stupid", "lazy" and spacey") (but were not connected to racism), were offhand comments ("wig"), and some were clearly insensitive. Yet she has not shown that she was  threatened with discharge or encouraged to resign, she was not demoted or subject to reduced pay or benefits, or transferred involuntarily to a less desirable position or subjected to altered job responsibilities. By the time she left her position in October, Simmons (whom she said was hostile toward her) had been removed and replaced months earlier, and Weisser had scheduled her for the work stations she desired. At its core, Hanna's difficult or unpleasant working conditions do not rise to the level of being so intolerable that a reasonable person would be forced to quit. *Lucas v. City of Philadelphia*, 2013 WL 2156007, at *18 (E.D. Pa. May 17, 2013). *Suders,* 542 U.S. at 147. ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." (quoting *Perry v. Harris Chernin, Inc*., 126 F.3d 1010, 1015 (7th Cir. 1997)).

Accordingly, while Hanna has come forward with evidence that could support a claim that Defendants subjected her to a racially hostile work environment in violation of Title VII and the PHRA, she has not done so with respect to her constructive discharge claim. It is therefore respectfully recommended that the court grant Defendants' Motion for Summary Judgment as to Hanna's hostile work environment constructive discharge claim[3] but denied as to her  hostile work environment claims as alleged in Counts III and IV and enter judgment in Defendants' favor on those claims.

---

[3] We express no opinion as to the propriety of the request for back pay or front pay. Giant Eagle only requested summary judgment in the event the constructive discharge claim remained.

### 3. Counts V and VI: Retaliation

At the outset we note that Hanna concedes that her retaliation claim against Defendant Simmons must be dismissed because she admits she did not exhaust her administrative remedies against Simmons. ECF No. 77 at 25. Specifically, she did not name Simmons as a respondent in the Charges filed with the EEOC and the PHRA, although she identified him as an alleged discriminator. Ivy v. Verizon Pennsylvania, Inc., 2011 WL 1637939 at *3 (W.D. Pa. Apr. 29, 2011) (McVerry, J). It is therefore respectfully recommended that Count VI be dismissed with prejudice.

In Count V of the Complaint, Hanna contends that Giant Eagle retaliated against her in violation of the PHRA "by denying her employment opportunities" because she allegedly complained about racial discrimination and filed a charge of discrimination with the EEOC. Complaint ¶ 181. As summarized by the Court of Appeals for the Third Circuit, the prima facie case elements for a retaliation claim are as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006). The Court of Appeals has explained that a plaintiff can substantiate a causal connection between the protected activity and an adverse employment action by: 1) showing that the temporal proximity is "unduly suggestive"; or 2) showing "inconsistencies in the defendant's testimony"; or 3) pointing to ongoing antagonism. *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 280-81 (3d Cir. 2000).

To establish protected activity, the plaintiff must establish that he "opposed conduct that a reasonable person could believe violated Title VII's standard for unlawful discrimination." *Moore*, 461 F.3d at 344("[R]etaliation plaintiffs must 'act[ ] under a good faith, reasonable belief that a violation existed' " (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996))) (second alteration in original). In other words, "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." *Theriault v. Dollar Gen.*, 336 Fed. Appx. 172, 174 (3d Cir. 2009) (citing *Wilkerson v. New Media Tech. Charter Sch. Inc.,* 522 F.3d 315, 322 (3d Cir. 2008)).

The first instance of alleged retaliation was when Hanna was issued a Counseling & Corrective Action Report, dated May 9, 2014 after she was complained to Simmons that she had been approached by another employee (who worked at the Eagles Nest, not the Pharmacy) in the bathroom who accused her of stealing her feminine product. The issuance of the report, as Giant Eagle argues and as discussed above, was issued based upon computer generated data in Hanna's punch clock time records. Hanna also alleges that the mistaken issuance of a Counseling and Corrective Action Report on May 19, 2014 was retaliation. There is no dispute that this was retracted when Giant Eagle recognized its error. As to these first two incidents of alleged retaliation, we note that the evidence of record establishes that the Hanna went to the EEOC on May 24, 2014 and Giant Eagle was first notified that Hanna had filed a charge of discrimination on July 8, 2014. Plaintiff admits she did not tell anyone at Giant Eagle that she had filed a charge, but nevertheless speculates that "it was fairly common knowledge that she was initiating some kind of legal action against Giant Eagle, in the summer of 2014." This self-serving testimony is contradicted by record evidence, and no reasonable fact-finder could decide that Giant Eagle retaliated against her protected conduct.

Hanna also states she was retaliated against when Simmons and Kristin Olejar (pharmacist intern) attempted to make her late for work by changing her schedule, which we have found is unsupported by the evidence. Even if true, she was not harmed by the incident because the showed up early and clocked in on time.

Hanna alleges that the September 26, 2014 Performance Feedback Form was retaliation. Weisser wrote up Hanna for inappropriate conduct towards a customer, including "walking away from customer," which is a violation of Giant Eagle policy. Plaintiff has not shown any record evidence that Weisser was aware that she had filed a charge of discrimination with the EEOC and PHRC, nor has she shown the requisite causal connection between her protected activity and the decision to counsel her for walking away from a customer.

Even if these incidents were retaliatory in nature, Giant Eagle argues, Hanna cannot establish that she suffered material adverse employment action that would dissuade a reasonable worker from making or supporting a charge of discrimination. We agree.

It is therefore respectfully recommended that the motion for summary judgment be granted with respect to Count V and that judgment be entered in favor of Giant Eagle.

### 4. Civil Battery

Counts VII and VIII allege claims of state law civil battery arising out of an incident during work and at a work function when pharmacy employees met at a bowling alley. Hanna has also stated that some co-workers purposely bumped into her and that she was physically moved to another work station against her will. Giant Eagle does not assert that there is no genuine issue of material fact with respect to these claims, but rather argues that we should decline to exercise pendant jurisdiction or these state law claims. Because it is recommended that some of the federal claims should proceed to trial, the motion for summary judgment should

be denied as to the claims for battery under Pennsylvania law.

### E.  Conclusion

For the reasons stated herein, it is respectfully recommended that the Defendant's Motion for Summary Judgment be granted in part as to Counts I and II (granted as to the allegations of discrimination in the application of the attendance policy and hiring process), granted in part as at Counts III and IV (as to constructive discharge), granted as to  Counts V and VI of the Complaint (retaliation), and denied as to Counts VII and VIII (battery).

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed. R. Civ. P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file objections will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n. 7 (3d Cir. 2011).


/s/  *Robert C. Mitchell*
Robert C. Mitchell
U.S. Magistrate Judge


Cc:  record counsel via CM-ECF